848 F.2d 398
 56 USLW 2696
 Jeryline RANSOM, Cynthia Muse, James Willis, Alicia Powell,
and Rose Tull, on behalf of themselves and all
others similarly situated, Appellants,
v.
William MARRAZZO, Individually and in his official capacity
as Commissioner of the Water Department of the City of
Philadelphia; Christine M. Murphy, in her official capacity
as Commissioner of the Revenue Department of the City of
Philadelphia; City of Philadelphia.
 No. 87-1715.
 United States Court of Appeals,
Third Circuit.
 Argued May 3, 1988.
Decided May 25, 1988.
Rehearing and Rehearing En Banc Denied July 26, 1988.
 
 Wayne Wynn (argued), Jonathan M. Stein, John Hanger, Community Legal Services, Inc., Philadelphia, Pa., for appellants.
 Seymour Kurland, City Sol., Pamela Foa, Divisional Deputy City Sol., Abby L. Pozefsky (argued), Chief Asst. City Sol., Philadelphia, Pa., for appellees.
 Before GIBBONS, Chief Judge, and MANSMANN and COWEN, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Chief Judge:
 
 
 1
 Appellants Jeryline Ransom, James Willis, Cynthia Muse, Alicia Powell and Rose Tull appeal from the dismissal of their amended complaint, seeking injunctive and declaratory relief against the City of Philadelphia on behalf of the class of Philadelphia residents to whom water and sewer service was denied unless they paid the delinquent service charges incurred, but not paid, by the prior customers of water services at their residences. The district court refused the plaintiffs' prayer for a declaration that the policy and practice of requiring water and sewer service applicants to satisfy pre-existing debts incurred for services rendered to their residences violate the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution and the Civil Rights Act, 42 U.S.C. Sec. 1983. Instead, the district court granted the defendants' motion to dismiss on the ground that Philadelphia's policy of "denying water and sewer service to subsequent property owners whose properties were subject to liens for delinquent charges until arrangement for payment of delinquent bills is made is not violative of constitutional constraints." Order of the District Court at 1. As grounds for dismissing the plaintiffs' state law claims the district court also held that: (1) the two remedies for nonpayment of water charges of liens and the denial of service are both authorized under state and local law, P.L. 207 Sec. 3, as amended, Pa.Stat.Ann., tit. 53, Sec. 7106 (Purdon 1972) (the "Commonwealth Municipal Claims and Liens Law"); Philadelphia Code Secs. 19-1606(2)(c); (2) liens are enforceable against the properties in question; and (3) such liens, and the alternative remedy of denial of service until satisfaction of charges, "followed the property" through transfers subsequent to the charges being incurred. Id. at 1-2.
 
 
 2
 On appeal, the plaintiffs continue to press their federal claims that the policy of conditioning service to them on the payment of charges incurred by prior customers violates their constitutional rights to equal protection and due process and, further, that the city's failure to promulgate standards adequate to provide notice to applicants of this condition on service also violates the Due Process Clause of the Fourteenth Amendment. They also dispute the district court's characterization of the class of plaintiffs as all owners of the affected property, thereby challenging the court's rationale that lien and denial of service remedies reached the class under state and local law simply by virtue of "following the property."We conclude that the putative class includes non-owner occupants as well as owners, and therefore, ownership of the affected property cannot be the sole basis of dismissal for failure to state a claim. We hold, however, that both state-authorized liens for non-payment of water and sewer bills, and the local law remedy of denying service until charges for services rendered are satisfied, may be constitutionally applicable to the properties where unpaid services were rendered, regardless of whether the applicant is personally liable for the charges, and regardless of whether the applicant is an owner of the property or a mere occupant. We further hold that the challenge to the inadequacy or absence of standards providing notice of this condition on receiving service is rendered moot by the City of Philadelphia's Revenue and Water Departments' promulgation of the Residential Customer Service Regulations, which adequately inform applicants of the effect of non-payment by prior customers on subsequent applicants for service. Thus, we will affirm the dismissal of the amended complaint.
 
 
 3
 * Standard of Review
 
 
 4
 The test to be applied in deciding a motion to dismiss for failure to state a claim requires this court to accept as true the factual allegations in the complaint and all reasonable inferences that can be drawn from them, and to refrain from granting a dismissal unless it is certain that no relief could be granted under any set of facts which could be proved. D.P. Enterprises v. Bucks County Community College, 725 F.2d 943, 944 (3d Cir.1984). Accordingly, we base our decision to dismiss on the ground that the facts alleged in the complaint, even if true, fail to support the Sec. 1983 claim against the City of Philadelphia.
 
 II
 The Facts
 
 5
 The plaintiffs are all non-tenant[1] occupants of Philadelphia residences who were denied, or were threatened with being denied, water and sewer services because of outstanding service charges to their residences incurred prior to their occupancy or application for service at those same residences. Liens for unpaid water and sewer bills are recorded at the Prothonotary's Office of the Philadelphia Court of Common Pleas in "lien books" and on microfilm for all of the residential properties in question in this case. Affidavit of James Kelly, Accountant in the City of Philadelphia's Water Revenue Bureau (responsible for the filing of liens against properties for delinquent water/sewer bills); Affidavit of Pat Evangelista, Legal Supervisor in Judgment and Liens, Prothonotary's Office, Philadelphia Court of Common Pleas. However, these liens are not located in the "Judgment Index" of the Philadelphia Court of Common Pleas. Affidavit of Valeria Bullock, Paralegal for Community Legal Services' Energy Project.
 
 
 6
 It is undisputed that James Willis, Cynthia Muse and Rose Tull are owners of the properties for which they seek water and sewer service. James Willis inherited his family's home at 3236 North Sydenham Street when his mother died in April, 1982. James Willis lived with his mother in the family home until her death, at which time the water and sewer bills had been paid in full. After his mother's death, in or about June 1983, James Willis went to live with his father and other relatives in Roanoke, Virginia, leaving the inherited property vacant until he returned, approximately three years later, in June 1983. Upon his return, he found that the water service had been terminated and several water bills had accrued during the three year period of his absence. When Mr. Willis inquired, the Water Revenue Bureau of Philadelphia informed him that service would not be restored until the Bureau received approximately 50% of a delinquent balance of $870.12. Because Mr. Willis' income is limited to a public assistance grant of $186.00 per month, he applied for and received a $300 grant from the federally-sponsored Low-Income Heating Energy Assistance Plan which was accepted by the Water Revenue Bureau. However, the Bureau continued to refuse service to Mr. Willis because of the remaining balance of $570.72, and on the further ground that Mr. Willis had not demonstrated an allegedly necessary "ownership interest" in the property.
 
 
 7
 Like Mr. Willis, Cynthia Muse also inherited an ownership interest in her family's home at 5439 Pine Street when her parents died in October, 1983. Ms. Muse remained with her brother at 5439 Pine Street after her parents died until July, 1985, when she was forced out by her brother's physical abuse. Ms. Muse's brother lived on alone in the house until he was sent to prison in November, 1986, at which time she returned to the property. Ms. Muse then discovered from the Water Revenue Bureau that the water service had been terminated in October, 1986 because of her brother's failure to make payments, and that service would not be restored until the delinquency in the amount of approximately $1,000.00 was paid in full. Ms. Muse and her two children, including a baby, had to live without water at their house from November, 1986 to July, 1987.
 
 
 8
 Rose Tull acquired the property at 2525 W. Firth Street pursuant to a real estate installment sales agreement, under which the seller agreed to pay the water and sewer bills up to the time of settlement. Prior to settlement, the seller failed to pay the bills and, consequently, the city terminated water service to 2525 W. Firth Street. Upon receiving Ms. Tull's explanation of the installment sales agreement, the Water Revenue Bureau restored water service to the property and agreed to seek payment from the seller pursuant to its policy then represented to Ms. Tull of not terminating service to non-owner occupants. But when title passed to Ms. Tull, she received a bill for $6,147.65 for unpaid services received during the time covered by the seller's agreement to pay. The Bureau has threatened to terminate service if payment is not made, but agreed to postpone termination pending the outcome of this litigation.
 
 
 9
 Alicia Powell, her infant daughter and older son lived with her husband, William Powell, the owner of record and customer of record for water and sewer service, at 155 E. Mayland Street until June 15, 1986. At that time, domestic abuse led Ms. Powell to move out of her home. She subsequently obtained a protection from abuse order from the Philadelphia Court of Common Pleas prohibiting William Powell from visiting, living at, entering or attempting to enter the property at 155 E. Mayland Street until November 11, 1987. In November, 1986, after residing with her mother for a few months, Ms. Powell returned to the 155 E. Mayland Street property, where she found the water service terminated. Service has been restored, but the Bureau has threatened to terminate it unless she arranges for the payment of a delinquent bill in the amount of $1,532.39 incurred by her estranged husband. The defendant-appellees contend that Alicia Powell has an ownership interest in the home as marital property; Ms. Powell denies ownership. We need not, however, resolve this disputed point of state law since Ms. Powell is either an owner or an occupant, but not a tenant, and we conclude that both owners and occupants are subject to the termination of service remedy. See infra.
 
 
 10
 Jeryline Ransom is not the owner of the property at which she resides, 2530 Ingersoll Street, but is rather the guardian of the minor property owner, her cousin, Mark Cromartie. All of the assets of Mark's mother's estate, including 2530 Ingersoll Street, are being held in trust for Mark with a Mr. Melvin Brookman, Esquire named as Trustee. Mark was originally left in the custodial care of Jeryline Ransom's mother, Helen Ransom. When Helen Ransom died in February, 1984, leaving care and custody of Mark to Jeryline, the latter moved to 2530 Ingersoll Street with Mark and her own four-year old son "because she and the children had no other place to live." At the time Ms. Ransom and the children moved into the house it had no water service. When Ms. Ransom applied to the Water Revenue Bureau for service, a customer service representative informed her that service would not be restored until the Bureau received a $300 deposit and a promise of the payment of a further $500 within 30 days towards the satisfaction of an outstanding water and sewer bill of approximately $1,800.00 incurred in Dorothy Cromartie's name. Ms. Ransom asserts that she was unable to arrange for the payments to be made by Mark's Trustee. Consequently, Ms. Ransom and children lived without water service to their house from May to November, 1986.
 
 
 11
 The Philadelphia Water Revenue Bureau is a subdivision of the City's Department of Collections, established under Philadelphia's Home Rule Charter, 351 Pa. Code Sec. 6.6-201(c). Under subsection 6.6-201(c) of the Philadelphia Home Rule Charter it is the responsibility of the Department of Collections to "collect all water and sewer rents due to the City." A separate Water Department is charged under section 5.5-800 et seq. of the Home Rule Charter with operating the City of Philadelphia's water and sewer service systems, 351 Pa. Code Sec. 5.5-800(a) and (b), and with setting standards for rates and service charges sufficient "to yield to the City at least an amount equal to operating expenses and interest and sinking fund charges on any debt incurred or about to be incurred for water supply, sewage and sewage disposal purposes." 351 Pa. Code Sec. 5.5-801. Accordingly, the plaintiffs brought this suit against the City of Philadelphia both through the Water Department and its Commissioner, William Marrazzo, and through the Department of Collections (also referred to as the Revenue Department) and its Commissioner, M. Christine Murphy.
 
 
 12
 At the time of the incidents of service denial or threat of denial alleged in the amended complaint, the city's standards of eligibility for customer service were not published. One day after the amended complaint was filed, however, on May 29, 1987, the City Water and Revenue Departments filed "Residential Customer Service Regulations," a final version of which was promulgated on November 18, 1987, effective December 18, 1987. These regulations specify that an owner, tenant or occupant of a residential property may become a water/sewer service customer unless (a) the applicant is an agent of a customer to whom service has been properly denied because of payment delinquency, (b) the applicant is "legally responsible at this or another service address" for past due service charges, or (c) the applicant contracted to assume past due service charges as part of a rental or other agreement.[2] Residential Customer Service Regulations (RCSR) Sec. B.4(a), (b), and (c). The Regulations provide that eligibility will be determined by the Water Revenue Bureau according to the specified criteria. RCSR Sec. 8. The Regulations further authorize denial of service, or "shutoffs," by the Water Department for specific causes, and according to specified procedures. The grounds specified for shutoffs, in addition to emergencies, RCSR Sec. C.1, are: (a) customer delinquency for two billing periods plus 10 days, (b) the absence of a meter reading at a service address for 12 consecutive months, and (c) the denial of meter access to the Water Department or the Water Revenue Bureau, for two consecutive billing periods. RCSR Sec. C.2(a), (b), and (c). The Regulations require that prior to a shutoff, the Water Revenue Bureau must deliver notice to the affected customer including, among other information, the amount past due, the payment period, the date of the scheduled shutoff, and the steps available to the customer to avoid shutoff--namely, to pay the entire balance or negotiate a payment agreement, or to request a hearing if a dispute exists as to grounds for the shutoff. RCSR Sec. D.1. Under the Regulations, any service address is subject to a shutoff (on the grounds, and according to the procedures, specified), regardless of whether it is occupied by an owner, tenant, or invitee. However, tenants and occupants who are not customers are entitled under the regulations to avoid shutoff by paying the bill and deducting that amount from their rent. RCSR Sec. D.3. The Water Revenue Bureau is required by the regulations to provide non-customer tenants and occupants with notice of these and other rights. Id.
 
 III
 State and Local Law
 
 13
 There is no question that Pennsylvania state law authorizes the City of Philadelphia to impose liens against property benefited by unpaid water and sewer service. City of Philadelphia v. Northwood Textile Mills, Inc., 395 Pa. 112, 149 A.2d 60 (1959); Girard Trust Corn Exchange Bank v. Ermilio, 178 Pa.Super. 316, 115 A.2d 922 (1955). Specifically, the Act of May 16, 1923, P.L. 207, as amended, 53 P.S. Sec. 7107, creates the remedy of a lien against benefited property in favor of the municipality extending water and sewer services for the collection of delinquent rents.[3] The lien authorized by section 7107 is filed against the premises as a proceeding in rem, not in personam. Northwood Textile Mills, 149 A.2d at 62; Girard Trust, 115 A.2d at 923; Provident Trust Co. v. Judicial Building & Loan, 112 Pa.Super. 352, 171 A. 287 (1934).
 
 
 14
 In addition to the municipal lien remedy for uncollected charges authorized by Pennsylvania law, 53 P.S. Sec. 7107, a Philadelphia ordinance authorizes the Philadelphia Water Department to deprive premises of service if any water and sewer rent charge remains unpaid for two cycles and 10 days after notice has been served to the delinquent property owner. Phil. Code Sec. 19-1606(2)(C) (effective 1956). A precursor to section 1606(2)(C) of Title 19 of the Philadelphia Code, also authorizing the Water Department to deprive premises of service until delinquent charges are paid, was approved by the Pennsylvania Supreme Court in Northwood Textile Mills, 149 A.2d at 62. The shutoff remedy specified in the newly promulgated Residential Customer Service Regulations is thus not an innovation, but merely an incorporation of the shutoff remedy authorized by section 1606(2)(C) of Title 19 of the Philadelphia Code and its precursors and approved by the State Supreme Court.
 
 
 15
 The plaintiffs claim that liens against the properties in question have not been perfected because of alleged errors in the indexing of the liens. Under Pennsylvania law, claims of the City of Philadelphia become liens only after being docketed by the prothonotary. 53 P.S. Sec. 7106(b); see In re Aikens, 83 B.R. 344, (Bankr.1988). Section 7106(b) further mandates that "[t]he prothonotary shall enter the claim in the judgment index." As observed in the recent bankruptcy case, In re Aikens, section 7106(b), which was added after the general authorization of municipal liens in 53 P.S. Sec. 7106(a) by a 1963 amendment, "has the rather odd effect of specifically providing that claims in the City of Philadelphia, the only city of the first class in the Commonwealth, 16 P.S. Sec. 210(2), and nowhere else, become liens only after they are docketed."
 
 
 16
 The plaintiffs aver by affidavit that liens for unpaid water and sewer bills on the properties in question are not located in the judgment index. Affidavit of Valeria Bullock. The defendants respond that the liens are recorded in the lien index of the prothonotary's office. Affidavit of Pat Evangelista. As the record-keeping practice is described in In re Aikens,
 
 
 17
 water liens are contained in volumes which are located in the Prothonotary's office in which each entry is given a court term and number. However, the court term and number is not established by the Prothonotary's office, as is the case in other court filings. Rather, the water department itself designates the numbers, assigning the same according to the department's own, street-related account numbers from its computer print-outs. A volume with such print-outs is delivered to the Prothonotary once annually, usually in the fall. The names of the property owners on these print-outs are not in alphabetical order, as they are in the judgment index, but according to addresses. The Prothonotary's office does virtually nothing with the volumes except to act as their custodian and make them available to the public upon request.
 
 
 18
 In re Aikens, supra. As the plaintiffs' affidavit confirms, and the defendants' affidavits do not deny, the liens are not entered in the judgment index of the prothonotary, but rather in a separate lien index.
 
 
 19
 The question then becomes how the city's failure to have the liens entered in the judgment index, as directed by 53 P.S. Sec. 7106(b), affects the validity of the liens with respect to the properties in this case. The plaintiffs contend that the city's failure to perfect the liens, by properly indexing them, renders them invalid. We find that the liens are not rendered invalid by the improper indexing as against any of the plaintiffs because under section 7432 of Title 53 of the Pennsylvania Statutes[4] liens can be filed or, where improperly filed, refiled at any time except as against bona fide purchasers and mortgagees to whom property is transferred prior to perfection. Sanft v. Borough of West Grove, 63 Pa.Cmwlth. 366, 437 A.2d 1332, 1333-34 (1981) (municipal claims for water rates should not be stricken for untimeliness because 53 P.S. Sec. 7432 authorizes the filing of municipal claims at any time, limited only to protect the rights of intervening purchasers or lienors); Sewer Authority of City of Scranton v. Arnold, 35 Pa.Cmwlth. 262, 385 A.2d 1034, 1035 (1978) (53 P.S. Sec. 7432 prohibits the attachment of imperfected liens against property transferred to a purchaser prior to perfection); City of Lancaster v. Binkele, 57 Lanc.Rev. 519, 75 York 125 (1962) (53 P.S. Sec. 7432 provides that where a failure in filing a municipal claim has caused the lien of such claim to be lost, the claim may now be filed properly as a lien and collected, except as to purchasers and mortgagees). Cf. In re Aikens, supra (without considering 53 P.S. Sec. 7432, holding that a failure to enter claim in the judgment index does not render municipal lien invalid as between a judgment creditor and judgment debtor, but suggesting that the result might differ if the trustee were to challenge the validity of the lien). In addition to section 7432, which extends the time limit for filing and, hence, perfecting liens indefinitely except as to property that has already passed to purchasers and mortgagees, section 7143 provides the City with a period of three years after the rates become payable within which to file a lien. See, e.g., Chartiers Valley School District v. Virginia Mansions Apartments, Inc., 340 Pa.Super. 285, 489 A.2d 1381, 1390 (1985) ("sections 7143 and 7432 together establish a three-year limitations period for the filing of municipal claims, while allowing a municipality which has failed to file within that time to file later, but with protection for [purchasers' and lienors'] interests which attached while the lien of the municipal claim was lost by reason of the municipality's failure to file timely").
 
 
 20
 Leaving aside plaintiff Rose Tull for the moment, we find that the liens on the properties inhabited by James Willis, Cynthia Muse, Alicia Powell and Jeryline Ransom are perfectible because none of these individuals are purchasers or mortgagees protected from the attachment of a lien against their property at any time under section 7432 and, alternatively, the three-year time limit established for filing municipal liens under section 7143 has not expired on some of the claims. James Willis and Cynthia Muse inherited 3236 North Sydenham and 5439 Pine Street respectively; hence, both are heirs, not purchasers or mortgagees. Jeryline Ransom is a mere occupant of 2530 Ingersoll Street, and hence cannot claim the protection against the city's perfection of its lien under section 7432; nor could her ward, Mark Cromartie, who acquired the property as an inheritance. Alicia Powell is either, like Ms. Ransom, a mere occupant, or if she does have an ownership interest, she acquired it not by purchase or mortgage subsequent to the city's attempt to impose a lien as is necessary to trigger the protection against perfection extended by Sec. 7432, but rather as marital property shared with her husband, William Powell, the owner of record.
 
 
 21
 In addition to the fact that none of these plaintiffs have the status of intervening purchaser or mortgagee protected under Sec. 7432, at least some of the liens against 2530 Ingersoll Street (Ms. Ransom's home), 5439 Pine Street (Ms. Muse's home), 3236 North Sydenham Street (Mr. Willis' home) and 155 Mayland Street (Ms. Powell's home) were entered in the lien index within the last three years and hence presumably could now be refiled in the judgment index, properly, before the three-year time limit on filing liens, established in 53 P.S. Sec. 7143, runs out.
 
 
 22
 Rose Tull, alone among the plaintiffs, obtained her property (2525 W. Firth Street) by purchase. Hence, we must consider whether she is protected against the liens as an intervening purchaser under section 7432. According to the facts alleged in the amended complaint, which we must accept for purposes of evaluating a motion to dismiss, Ms. Tull purchased 2525 W. Firth Street via an installment sales agreement which she entered into in March, 1973. Under the terms of the sales agreement, the seller was responsible for water and sewer bills until title passed to Ms. Tull. Title passed to Ms. Tull in May, 1986. Thus, by contract with Ms. Tull, the seller was responsible for paying the water and sewer bills from 1973 to July, 1976. Because the seller failed to pay the bills, the Water Revenue Bureau terminated service in 1975. But upon receiving Ms. Tull's explanation of the terms of her installment sales contract, the Bureau restored service in 1975 and agreed to seek payment from the seller. Not until September, 1986, eleven years after this exchange with the Water Revenue Bureau, did Ms. Tull receive a water and sewer bill--in the amount of $6,147.65 for delinquent charges accrued during the period from July, 1973 to July, 1986. In the meantime, the Water Revenue Bureau had filed imperfect liens on 2525 W. Firth Street in the prothonotary's lien index in the years 1978, 1979, 1980, 1981, 1982, 1984 and 1985.
 
 
 23
 The question is whether Ms. Tull, who entered into an installment sales contract on, and moved into the property in 1973 but did not receive title until 1986, counts as an intervening purchaser under section 7432. To begin with, we note that for purposes of section 7143, which determines the liability for municipal improvements as between vendors and purchasers where real estate is "sold" before the claim is filed but after the improvement has begun, the Superior Court of Pennsylvania has held that real estate conveyed through an unconditional installment sales contract is "sold" at the time of the agreement, rather than at the time of settlement. Byrne v. Konig, 231 Pa.Super. 531, 332 A.2d 472, 474 (1974). The Byrne court based this decision on the doctrine of equitable conversion, under which the purchaser becomes equitable or beneficial owner, bearing the risk of loss for injury occurring to the property after execution of the sale agreement and before the settlement, while the vendor retains a mere security interest for the payment of the unpaid purchase price. Because the same conditions, under the doctrine of equitable conversion, obtain here in the case of Rose Tull's real estate installment sales agreement, we believe that the Pennsylvania courts would find that the "sale" of 2525 W. Firth Street to Rose Tull occurred at the time of the agreement for purposes of section 7432; accordingly, Rose Tull became a purchaser before the municipal claims were levied and, hence, she is not an intervening purchaser within the meaning of section 7432.
 
 
 24
 The fact that Ms. Tull and the vendor explicitly contracted for the latter to assume the obligation of paying for water and sewer service until settlement, while suggesting grounds for a possible suit in contract against the vendor, does not change the outcome in this case against the city. So long as Ms. Tull did not purchase the property subsequent to the filing of the municipal claims--as we have determined that she did not under Pennsylvania law, see Byrne v. Konig, supra--the city is still entitled under section 7432 to perfect its liens against her property. If the city's representations to Ms. Tull in 1975 that it would hold the seller and not her responsible for the charges at that time, give rise to any claim against the city on Ms. Tull's part, such a claim forms no part of the amended complaint under review and thus provides no argument here against finding that the city's liens can be perfected and enforced against Ms. Tull's property, as they can against all the other properties at issue in this case. We conclude, in sum, that all of the properties in this case are subject to perfectible and enforceable liens.
 
 
 25
 The plaintiffs contend that even if the liens are valid, as we have found they are, there is no basis in state law for denying service to persons for past due charges incurred prior to their ownership or occupancy. Pennsylvania law, however, is clearly to the contrary. It is true that the denial of service, or shutoff, remedy is a creature of city ordinance, Phila. Code Sec. 19-1606(2)(c), and thus is not specifically authorized by state statute. However, as we stated, the Pennsylvania Supreme Court has explicitly recognized and approved Philadelphia's shutoff ordinance. Northwood Textile, supra, 149 A.2d at 62 (discussing Title 19, section 1606(3) of the Code of General Ordinances of the City of Philadelphia, the precursor to Title 19, section 1606(2)(c)). The state supreme court in Northwood Textile recognized the city shutoff ordinance as an "alternative" to the remedy provided by the state in 53 P.S. Sec. 7107 of enforcing a lien--as an "additional remedy," the purpose of which is "to give the Department a lever which would enable it to force the payment of past due water rents as well as prevent the accumulation of a larger delinquency." Id. Therefore, we conclude that the denial of service remedy created by Philadelphia ordinance is authorized under state law.[5]
 
 
 26
 The fact that Phila. Code Sec. 19-1606(2)(c), providing the shutoff remedy, is authorized under state law does not entirely dispose of the question of whether this remedy can be applied to premises in which the service customer or applicant did not personally incur the past due charges. The plaintiffs would have it that the shutoff remedy cannot be imposed except against one who is personally responsible for the payment delinquency. In addition to the lien remedy, Pennsylvania law, 53 P.S. Sec. 7251, also provides the City of Philadelphia with an action in assumpsit against the owner of the property at the time the water or sewer rates became payable, thereby making the owner personally liable for the charges. Plaintiffs claim that none of them are personally liable for the charges, none having been owners at the time the charges became payable, and, therefore, service cannot be denied to them. With the exception of Rose Tull, who arguably was an "owner" at the time the charges became payable, see p. 406 supra, and is hence liable to an action in assumpsit under section 7251,[6] we agree that the plaintiffs are not personally liable for the past due charges. But the absence of personal liability has no bearing on the applicability of Philadelphia's shutoff remedy. Phila. Code Sec. 19-1606(2)(c). As the Residential Customer Service Regulations spell out in detail, the shutoff (denial of service) remedy for non-payment is authorized regardless of whether the premises are inhabited by owners, tenants or mere occupants, and regardless of whether the inhabitants are customers or not. See RCSR Secs. C. and D. Thus, like the lien remedy, the shutoff remedy provided by city ordinance does not impose unconditional personal liability, but rather, affects the property, merely making payment of delinquencies a condition of continuation of service. See Girard Life Ins. Co. v. Philadelphia, 88 Pa. 393 (1879); see generally 19 ALR 3d 1227, 1248 (1968); accord Girard Trust, 115 A.2d at 923 (stating that the fact that Philadelphia ordinance authorizes the Water Bureau to shut off the water supply where charges are unpaid does not make a tenant subject to in personam liability unless such personal liability is contractually assumed). As an in rem remedy, affecting the premises, the shutoff remedy is not conditional on the status of the occupant of the premises, nor indeed on the presence of an occupant--unless some separate source of law, not found in this case, specifically requires the provision of service to a certain class of applicants notwithstanding the encumbrance of the property.[7] Therefore we conclude that the denial of service to the properties in question is authorized by state law.
 
 IV
 Fourteenth Amendment Claims
 
 27
 The plaintiffs raise a combination of equal protection, and substantive and procedural due process challenges to Philadelphia's policy and practice of conditioning water and sewer service on the satisfaction of pre-existing debts. We agree with the district court that the policy and practice do not violate constitutional constraints.
 
 A. Procedural Due Process
 
 28
 The plaintiffs' procedural due process contention focuses on the absence of regulations or standards which would have put water and sewer service customers and applicants on notice of the city's policy of requiring payment of pre-existing debts as a condition of obtaining or maintaining water service, and the resulting arbitrary and capricious ad hoc determinations of eligibility by the Water Revenue Bureau. It is well-settled that the expectation of utility service rises to the level, articulated in Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972), and Perry v. Sinderman, 408 U.S. 593, 602, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972), of a "legitimate claim of entitlement" encompassed in the category of property interests protected by the Due Process Clause. Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 9, 98 S.Ct. 1554, 1560, 56 L.Ed.2d 30 (1978). Accord, Koger v. Guarino, 412 F.Supp. 1375, 1386 (E.D.Pa.), aff'd without opinion, 549 F.2d 795 (3d Cir.1977) (holding that "a water user has a 'legitimate claim of entitlement' to continued water service which is a property interest to which the Due Process Clause of the Fourteenth Amendment applies.") As a constitutionally cognizable state law property interest, the interest in receiving water service is subject to the tri-partite balancing analysis of 1) the property interest, 2) the risk of erroneous deprivation, and 3) the government's interest, articulated in Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), for a determination of what procedural safeguards are due. See Memphis Light, 436 U.S. at 17-19, 98 S.Ct. at 1564-65 (applying the Eldridge balancing approach to find that "some administrative procedure for entertaining customer complaints prior to termination is required to afford reasonable assurance against erroneous or arbitrary withholding" of utility services); Koger, 412 F.Supp. at 1386-89 (determining, on application of the Eldridge test to Philadelphia's denial of water service policy, that due process requires notice and opportunity for a hearing prior to water service termination). The plaintiffs specifically argue that the procedural safeguard of published standards, governing the conditions of service denials, is due under the Due Process Clause.
 
 
 29
 We need not, however, engage in the Mathews v. Eldridge balancing analysis to determine if due process requires the publication of service denial standards, because the question has been mooted by the city's publication of precisely that in the form of its Residential Customer Service Regulations, filed November 18, 1987, effective December 18, 1987. The issuance of new regulations during the pendency of a lawsuit will moot the controversy where the prayer for relief is answered by the promulgation. See, e.g., Associated Third Class Mail Users v. U.S. Postal Service, 662 F.2d 767, 769-70 (D.C.Cir.1980) (controversy concerning temporary rate increases based on previous procedures rendered moot by adoption of new rate-requesting procedures by the postal service); Parrish v. Board of Comm'rs of Alabama State Bar, 533 F.2d 942, 945-46 (5th Cir.1976) (complaint seeking relief from a rule against sitting for bar exam for a fourth time rendered moot by amendment during pendency of litigation of statute to eliminate the fourth-time limit). This principle that the promulgation of rules and standards answering a prayer for relief renders the controversy moot conforms to the more general principle, enunciated by this court in Hudson v. Robinson, 678 F.2d 462, 465 (3d Cir.1982), that "[i]f a defendant has discontinued challenged activities ..., the case is moot if there is no reasonable expectation that the wrong will be repeated." (citing United States v. W.T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953); Cobb v. Aytch, 472 F.Supp. 908, 920 (E.D.Pa.1979), aff'd in relevant part, 643 F.2d 946 (3d Cir.1981)).
 
 
 30
 Plaintiffs argue that the publication of the Residential Customer Service Regulations does not answer their prayer for relief, thereby mooting the issue, because they still fail to provide adequate notice that the satisfaction of pre-existing debts is a condition of receiving service. Thus, they assert, the wrong-- constitutionally inadequate notice-- can reasonably be expected to be repeated, contrary to the mootness requirement established in Hudson v. Robinson. We disagree. The Regulations plainly state that the Water Department is authorized to deprive premises of service ten days after a customer is delinquent for two billing periods. RCSR Sec. C.2 (a). The Regulations authorize shutoffs for nonpayment regardless of whether the premises are inhabited by owners, tenants or mere occupants, and regardless of whether the inhabitants are customers or not. See RCSR Secs. C. and D. As for clearly defining the terms of eligibility to become a water/sewer service customer, the Regulations specifically exclude applicants who have "not paid or arranged to pay for past due charges for water/sewer service for which the applicant is legally responsible at this or another service address...." RCSR Sec. B.3 (b) (emphasis added). The plaintiffs argue that the phrase "legally responsible" is so vague as to fail to satisfy the due process requirement of notice of the conditions of eligibility. It is true that the phrase "legally responsible" misleadingly suggests that applicants will be disqualified only for past due charges for which they are personally liable. In light of the standards governing the grounds for shutoffs, however, which clearly establish that the denial of service remedy does not establish personal liability, we think that the emphasized language, linking legal responsibility to a service address, adequately indicates that it is the property, and not the applicant personally, which is impressed with the liability for past due charges, and that, therefore, satisfaction of the liability impressed in the property is a condition of receiving service. We are not prepared to say that, as a constitutional matter, persons other than bona fide purchasers are entitled to more notice than this. Therefore, we conclude that the Residential Customer Service Regulations do adequately answer the plaintiffs' prayer for the promulgation of standards providing adequate notice of the conditions of receiving service, thereby rendering that prayer moot.
 
 
 31
 The plaintiffs further attempt to avoid the mooting of their procedural due process claims by asserting that the publication of the new regulations, even if they now satisfy the due process notice requirements, does not answer their claim of damages due to a deprivation of notice prior to their publication and resulting from the imperfection of the liens. The plaintiffs are correct in their contention that the issuance of the new regulations does not moot this damage claim based on the alleged constitutional notice defect prior to their publication. Therefore, we must apply the Eldridge analysis to the pre-regulation situation to determine the constitutional adequacy of notice at that time. We conclude that even before the more detailed Regulations were promulgated, the authority of the city to deprive a property, as to which service payments were delinquent, of water/sewer services was publicized as municipal law.[8] Under the Eldridge balancing test, the Due Process Clause does not require that applicants who are not purchasers intervening for value receive more notice than that. Although the private interest in receiving water and sewer service is strong, so too is the city's interest in recovering the costs of providing service. And no particular risk of erroneous deprivation of service due to inadequate notice was posed by section 19-1606(2)(c) in the absence of regulations because, as a substantive matter, it is not error to deprive service to property where unpaid services have been rendered, as section 19-1606(2)(c) provides, see infra 412-14, and the plaintiffs do not contend that the bills were paid. As a procedural matter, that section (like the new regulations which merely expound it) provides notice of this condition of service. Similarly, the Pennsylvania state law governing the perfectibility of liens properly balances the public interest in collecting payment for its claims against the private interests in receiving notice, to the satisfaction of the Eldridge balancing test for the adequacy of notice. Thus, 53 P.S. Sec. 7432 affords greater protection to the interests of intervening purchasers and lienors in receiving notice of the municipal claims than it does to other parties because, as purchasers for value they are entitled to notice of what they are paying for. By contrast, persons who acquire property gratuitously (or do not acquire property at all) cannot claim that their interest in notice of municipal claims outweighs the public interest in perfectibility because such persons do not lose anything, with or without notice. Thus, the claims of the plaintiffs for damages based on constitutionally defective notice fail under the Eldridge test.
 
 B. Substantive Due Process
 
 32
 The plaintiffs' chief complaint is not that notice or other procedural safeguards against the erroneous deprivation of water and sewer services are inadequate. It is rather that the deprivation of service, on the ground of payment delinquencies incurred by a party other than the applicant, is constitutionally erroneous per se. This claim represents a substantive due process challenge, seeking nothing less than a ruling that the practice and policy of conditioning water and sewer service on the satisfaction of pre-existing charges result in an unconstitutional deprivation of property regardless of the procedural safeguards installed. The plaintiffs claim, moreover, that such a ruling, with binding effect upon us, has already issued in Koger v. Guarino, 412 F.Supp. 1375 (E.D.Pa.1976), aff'd, 549 F.2d 795 (3d Cir.1977).
 
 
 33
 This argument is misguided on several counts. To begin with, as a district court decision affirmed without an opinion, Koger is not binding on this court. Moreover, contrary to the plaintiffs' characterization, Koger did not address the specific question at issue: whether the eligibility of a water/sewer service applicant can be conditioned on the satisfaction of past due service charges incurred by prior customers. Koger dealt rather with the particular question of whether tenants could be denied service because of service charge delinquencies for which their landlords were legally (contractually) responsible. Thus, the Koger court considered factors, not present in this case, characteristic of landlord-tenant relationships. Cf. Dunbar v. City of New York, 251 U.S. 516, 40 S.Ct. 250, 64 L.Ed. 384 (1960) (holding that the enforcement of a lien against a landlord for her tenant's water bill delinquency does not violate the landlord's substantive due process rights); Chatham v. Jackson, 613 F.2d 73 (5th Cir.1980) (upholding the City of Atlanta's policy of terminating water service to a landlord when the tenant's bills are delinquent against substantive due process and takings challenges); Davis v. Weir, 497 F.2d 139 (5th Cir.1974) (striking down the City of Atlanta's practice of refusing water service to a tenant when the landlord's service bill was in arrears as a violation of the Due Process and Equal Protection Clauses); West v. Village of Morrisville, 563 F.Supp. 1101 (D.Vermont 1983) (following Chatham and Dunbar in defending the enforcement of liens against the property of a landlord for the service bill delinquency of a tenant against a substantive due process challenge).
 
 
 34
 The critical point which causes us to reject reliance on the Koger opinion, however, is that we find its application of a substantive due process analysis to an applicant's interest in receiving water and sewer service to be fundamentally misplaced. But see Chatham, supra (considering a substantive due process challenge to the denial of water service to a landlord); Davis, supra (considering, and conceding, a substantive due process challenge to the deprivation of a tenant's interest in receiving water service). Substantive due process refers to and protects federal rights. The provision of water and sewer services, whether by a municipality or by a private utility company, is not, however, a federally protected right. See Koger, 412 F.Supp. at 1386 (observing that the City of Philadelphia is "not constitutionally obligated to establish and maintain water service for the benefit of [its] citizens...."). The legal fact that, once a municipality (or, for that matter, a private utility company) establishes a utility for its citizens, a citizen's expectation of receiving that service rises to the level of a property interest cognizable under the Due Process Clause, Memphis Light, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30; Koger, 412 F.Supp. at 1386, merely brings that expectation within the compass of the Fourteenth Amendment's procedural protections, measured according to the Mathews v. Eldridge analysis. It does not transform that expectation into a substantive guarantee against the state in any circumstance. Therefore, we reject the claim that conditioning the receipt of water and sewer service on the satisfaction of past due charges for services rendered to the applicant's residence raises the question of a substantive due process deprivation.
 
 C. Equal Protection
 
 35
 The plaintiffs also rely on Koger v. Guarino, 412 F.Supp. 1375 (E.D.Pa.1976), aff'd without opinion, 549 F.2d 795 (3d Cir.1977), Davis v. Weir, 497 F.2d 139 (5th Cir.1974), and the opinion in Craft v. Memphis Light, Gas and Water Division, 534 F.2d 684 (6th Cir.1976), aff'd on other grounds, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978), for the proposition that the city's practice of denying service to applicants at properties encumbered by past due charges violates the Equal Protection clause of the Fourteenth Amendment. We are not persuaded by the equal protection analysis of the Koger, Davis and Craft opinions.
 
 
 36
 Davis is the genesis of the line of precedent relied on by the plaintiffs. Davis involved a water service policy of the City of Atlanta similar to Philadelphia's policy at issue here. In Davis, the Court of Appeals for the Fifth Circuit held that the dual classification of water service applicants according to those whose contemplated service address is encumbered with a pre-existing debt, and those whose address is not so encumbered, violates the Equal Protection clause on two grounds: (1),
 
 
 37
 [a] collection scheme ... that divorces itself entirely from the reality of legal accountability for the debt involved, is devoid of logical relation to the collection of unpaid water bills from the defaulting debtor,
 
 
 38
 Davis, 497 F.2d at 144-45, and (2),
 
 
 39
 [t]he City has no valid governmental interest in securing revenue from innocent applicants who are forced to honor the obligations of another or face constructive eviction from their homes for lack of an essential to existence --water.
 
 
 40
 Id. at 145 (footnote omitted). On these two asserted grounds--invalidity of the governmental interest, and the absence of a logical relationship between it and the classification scheme--the Davis court found that the shutoff policy failed to survive even the most minimal level of equal protection scrutiny, traditionally applied to economic legislation: the test of a rational relationship between the classification scheme and a legitimate governmental end. See, e.g., United States Dept. of Agriculture v. Moreno, 413 U.S. 528, 533, 93 S.Ct. 2821, 2825, 37 L.Ed.2d 782 (1973) (quoted in Davis, 497 F.2d at 144). Following Davis, the Court of Appeals for the Sixth Circuit in Craft struck down a municipal policy of refusing to provide utility service to an applicant at an address where unpaid services were rendered in another's name, and the Eastern District Court of Pennsylvania in Koger struck down a Philadelphia policy of denying water service to tenants because of delinquent water bills owed by the owners of the premises, on the basis of the same two grounds.
 
 
 41
 Both grounds reflect faulty reasoning and mischaracterization. To begin with the legitimacy of the governmental interest involved, it cannot be maintained that a city does not have a valid interest in collecting payment for the services it dispenses, especially where, as in Philadelphia, the Home Rule Charter expressly mandates that the city collect all rents, and in an amount sufficient to cover all the expenses incurred in providing the service. See 351 Pa.Code Secs. 5.5-800 and 6.6-201(c). The Davis court unnecessarily restricts the characterization of the city's interest as not merely the collection of unpaid rents, but the collection of those rents "from the defaulting debtor." Davis, 497 F.2d at 145. But this is an unnecessary and misleading embellishment, which simply begs the question of the relation of means and ends. The city has a valid interest in collecting the unpaid rents from any source. Whether the means it adopts to achieve that end are legitimate is a separate question. Although there may be no logical relation between a classification scheme based on encumbrances on property that ignores personal liability and the narrow goal of collecting debts from debtors, see Davis, 497 F.2d at 145, Craft, 534 F.2d at 690 (quoting Davis ) and Koger, 412 F.Supp. at 1391 (same), there certainly is a logical relation between such a scheme and the more general goal of collecting debts, period. Therefore, we conclude, contra Davis, Craft and Koger, that the classification of service eligibility according to the presence or absence of encumbrances on the property does survive rational relationship scrutiny.
 
 
 42
 The Davis, Craft and Koger courts did not reach the question of whether a stricter standard of equal protection scrutiny was applicable to the denial of water service because they held that even deferential rational relation scrutiny required striking down the policies at issue. Davis, 497 F.2d at 144; Craft, 534 F.2d at 690; Koger, 412 F.Supp. at 1391-92. Since we do not agree with this holding, we must consider whether a less deferential standard of scrutiny is appropriate to classifications on the basis of which water service is denied.
 
 
 43
 We agree with the view of the Court of Appeals for the Fifth Circuit expressed in Chatham v. Jackson, 613 F.2d 73 (5th Cir.1980) that the strict standard of scrutiny reserved for legislation affecting fundamental rights is not applicable because,
 
 
 44
 "the importance of a service performed by the state does not determine whether it must be regarded as fundamental" for equal protection purposes, San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 30, 93 S.Ct. 1278, 1295, 36 L.Ed.2d 16 (1973), and because even the right to housing, Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972), and to welfare benefits, Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), while as crucial to existence as water service, are not so fundamental as to require the closest constitutional scrutiny, San Antonio Independent School District v. Rodriguez, supra, 411 U.S. at 32-33, 93 S.Ct. at 1296....
 
 
 45
 Chatham, 613 F.2d at 80. Without deciding whether the interest in receiving water and sewer service necessarily requires the application of the intermediate standard of equal protection analysis, we easily conclude that the requirements of that intermediate standard, articulated in Craig v. Boren, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) as the "substantial relation" of the classification scheme to "important governmental objectives," id. at 197, 97 S.Ct. at 457, are met by Philadelphia's shutoff policy. Undoubtedly, the city's interest in recovering its expenses laid out in providing water service rises to the level of "importance," and the method of conditioning such a strongly desired service on the satisfaction of payment delinquencies seems so calculated to encourage payment as to satisfy the test of a "substantial relationship" between legislative means and ends. We conclude, therefore, that the equal protection challenge to the city's policy must fail.
 
 V
 
 46
 We have concluded that the plaintiffs have failed to state an equal protection or due process claim. Therefore, the judgment dismissing the 42 U.S.C. Sec. 1983 complaint will be affirmed.
 
 
 
 [1]
 By "non-tenant" status, we mean to refer to the two categories, in addition to that of "tenant," specified for customer eligibility under the Philadelphia Water and Revenue Departments' Customer Service Regulations: (1) "owner " defined as "[a] person who has title to a property or his agent, servant or employee acting on his behalf"; (2) "occupant," defined as "[a] person to whom an owner has yielded possession of a residential property or dwelling unit and who has a reasonable expectation of residing at such dwelling unit for six months." Some of the appellants are owners, and others are or may be occupants. An occupant might conceivably be considered a tenant-at-will and, indeed, the regulations treat occupants and tenants similarly. But since the separate category of occupant is recognized in the regulations, and since none of the plaintiffs allege that they are tenants, we will consider the non-owner occupants as non-tenants. Thus, we do not reach the question of whether the asymmetries in the landlord-tenant relationship introduce an added constitutional dimension to the propriety of denying service to non-delinquent tenants, cf. Chatham v. Jackson, 613 F.2d 73 (5th Cir.1980) (upholding an Atlanta policy of denying water service to landlords for tenants' payment delinquencies in part on the basis of the difference between landlords and tenants in their relationship to the service rendered to the property); Davis v. Weir, 497 F.2d 139 (5th Cir.1974) (striking down Atlanta policy of denying service to tenants for landlord's payment delinquency in part because of relatively powerless position of tenants); Koger v. Guarino, 412 F.Supp. 1375 (E.D.Pa.1976), aff'd without opinion, 549 F.2d 795 (3d Cir.1977) (following Davis )
 
 
 [2]
 Other exceptions to eligibility to receive service, not relevant to the instant complaint, include circumstances where health code, safety and licensing require the denial of service
 
 
 [3]
 The precise language of section 7107 is:
 The lien for ... water rates, lighting rates, or sewer rates, or rates for any other service furnished by a municipality,--shall exist in favor of, and the claim therefor may be filed against the property thereby benefited by, the municipality extending the benefit....
 
 
 [4]
 The relevant text of section 7432 reads:
 Whenever, heretofore or hereafter, any county, city, borough, incorporated town, township, school district, poor district, county institution district or municipal authority has failed to file in the office of the prothonotary of the county, any tax claim or municipal claim assessed against any property within the time limit required by law for such filing, whereby the lien of such tax or municipal claim is lost ...; then, in any such case heretofore or hereafter occurring, any such county, city, borough, incorporated town, township, school district, poor district, county institution district or municipal authority may, at any time after the effective date of this act, file such tax or municipal claim, or amend such claim ...; and such claim ... so entered or revived shall be a valid claim ... and be a lien upon the real estate upon which it was a lien at the time the claim was filed ... and said claim ... may be revived or further revived and collected as other claims ... are revived and collected: Provided, that the lien of any such claim ... shall not reattach against any real estate transferred to any purchaser before such claim is filed or during the time when the lien of any such ... municipal claim ... was lost, nor shall the lien of any such claim ... impair or affect the priority of the lien of any mortgage or other lien which gained priority because of the failure of the county, city, borough, incorporated town, township, school district, poor district, county institution district or municipal authority to file [or perfect] such claim ...; nor shall any such lien so revived impair or affect the priority of the lien of any mortgage or lien which was entered prior to the ... municipal claim or which gained priority during the time such lien was revived or effective.
 
 
 [53]
 P.S. Sec. 7432 (1959, P.L. 955 Sec. 1; 1963, P.L. 177 Sec. 1)
 
 
 [5]
 We do not need here to decide whether the denial of service remedy would be authorized in the absence of a lien because we find that all of the properties in question are subject to perfectible and enforceable liens
 
 
 [6]
 We note again that there is no claim that the city is estopped from treating Ms. Tull as responsible for the charges at the time they were incurred because of its own alleged representations to Ms. Tull that it would treat the vendor as the party responsible for the charges
 
 
 [7]
 We do not reach the question of whether intervening purchasers and lienors, protected against the enforcement of unperfected liens under 53 P.S. Sec. 7432, are also protected against the municipal shutoff remedy because we do not reach the question of whether the authority to apply the shutoff remedy is based on the existence of a lien. See supra n. 5. Some courts have held that because of the special features of the landlord-tenant relationship, substantive due process requires that tenants may not be deprived of water service on the basis of past due charges for which they are not personally liable. See Davis v. Weir, 497 F.2d 139 (5th Cir.1974); Koger v. Guarino, 412 F.Supp. 1375 (E.D.Pa.1976), aff'd without opinion, 549 F.2d 795 (3d Cir.1977). We do not reach this question since none of the plaintiffs in this case present themselves as tenants. But we note that the reasoning of the Davis and Koger opinions is inconsistent with our understanding of substantive due process set forth in the text, infra, at pp. 412-14
 
 
 [8]
 Section 19-1606(2)(c) of the Philadelphia Code, effective 1956, states:
 If any water or sewer rent charge remains unpaid for two cycles after the bill has been rendered, the [Collections] Department shall serve a notice upon the delinquent property owner and if the charge, with penalties thereon, is not paid within 10 days after such service, the Department may, in its discretion, deprive the premises of water until the charge with penalties is paid.